# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| IRIS McGUFFIE, as personal representative of the Estate of Alford Ray McGuffie, deceased, ) ) ) ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-05-S-2473-M |
| ) | |
| MEAD CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This case is before the court on motions for summary judgment filed by

defendants MW Custom Papers, LLC, and MeadWestvaco Corporation,[1] as well as

two motions to strike.[2]  The action was originally filed in the Circuit Court of St. Clair

County, Alabama.[3]  The caption of the complaint named only Alford Ray McGuffie

as plaintiff,[4] but two persons actually were identified in the body of that pleading as

---

[1] *See* doc. no. 104 (MW Custom Papers, LLC's Renewed Motion for Summary Judgment), and doc. no. 106 (MeadWestvaco Corp.'s Motion for Summary Judgment).

[2] *See* doc. no. 107 (Plaintiffs' [*sic*] Motion to Strike and Objections to Defendants' Motions for Summary Judgment), and doc. no. 117 (MW Custom Papers, LLC's Motion to Strike Certain Exhibits in Plaintiff's Evidentiary Materials).

[3] *See* doc. no. 1-1 (State Court Civil Action Cover Sheet and Complaint filed Nov. 2, 2005), at 1.

[4] *Id.* at 2.  The Eleventh Circuit observed in *Marsh v. Butler County*, 268 F.3d 1014, 1023 n.4 (11th Cir. 2001) (*en banc*), that the caption of a complaint

> is not part of the statement of the claim under Rule 8.  The caption is something apart, being mandated by a different rule: Fed. R. Civ. P. 10.  The caption is chiefly for the court's administrative convenience.  It may, however, sometimes be useful to

plaintiffs: *i.e.*, Alford and his wife, Iris McGuffie.[5]   Seventeen claims were asserted

against numerous defendants, including The Mead Corporation and MeadWestvaco

Corporation.[6]   The gravamen of all of the claims was the allegation that Alford

McGuffie had contracted mesothelioma as a result of his exposure to airborne

asbestos fibers, originating from the use of raw asbestos fibers or asbestos-containing

materials in a pipe manufacturing facility in Ragland, Alabama, known as The

Cement Asbestos Products Company ("CAPCO").   Mesothelioma is a cancerous

disease of the lining of the lungs caused by exposure to airborne asbestos fibers that

---

look at the caption — when the Rule 8 statement of a claim is ambiguous about a
party's capacity — to settle pleading ambiguities.  *See Hobbs v. E.E. Roberts*, 999
F.2d 1526, 1529-30 (11th Cir. 1993) (using several factors, including caption, to
resolve ambiguity of whether official sued in official or individual capacity).  To use
the Rule 10 caption to create an ambiguity when the statement of the claim is itself
not ambiguous is incorrect.

*Marsh*, 268 F.3d at 1023 n.4.

[5] *See* doc. no. 1-1 (State Court Civil Action Cover Sheet and Complaint) at, *e.g.*, ¶ 1 ("*The
Plaintiffs*, *Alford and Iris McGuffie*, are adult residents and citizens of Ragland, Alabama.  *The
Plaintiffs* were exposed to asbestos fibers originating from the use and/or presence of raw asbestos
fibers and/or asbestos containing materials at Mr. McGufffie's worksites and numerous other
facilities within the area of Ragland Alabama.  The Defendants are jointly, severally and collectively
liable to *the Plaintiffs* for Mr. McGuffie's injuries resulting from said exposure.") (emphasis
supplied), ¶ 9 (last sent.) ("*The Plaintiffs* were exposed to asbestos fibers that were first released at
Mr. McGuffie's work place, *in his home*, car[,] and/or other location(s) where he carried it on his
work clothing.) (emphasis and alteration supplied).  As best this court can ascertain, however, the
only compensable claim asserted by Iris McGuffie was limited to an alleged loss of consortium.  *See
id*. ¶¶ 20, 102–05.

[6] MW Custom Papers, LLC, states in its brief in support of its renewed motion for summary
judgment that "there were thirty manufacturer defendants that allegedly manufactured products that
contained asbestos and which Plaintiff's decedent, Alford McGuffie, alleged he worked with or
around . . . ."  Doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its
Renewed Motion for Summary Judgment), at 1; *see also* doc. no. 105, at 1 (same).

usually is fatal.[7]

The case was removed to this court on December 1, 2005, by defendant MeadWestvaco Corporation ("MeadWestvaco").[8]   It should be noted that MeadWestvaco parenthetically referred to itself in the notice of removal as "Mead": *i.e.*, "Defendant MeadWestvaco Corporation (*hereinafter referred to as* 'Mead') hereby notices removal of this civil action from the Circuit Court of St. Clair County Alabama . . . ."[9]  The removal was based upon the contention that this court possessed "exclusive original jurisdiction over all controversies arising under" the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").[10]  The pertinent portions of the Notice of Removal read as follows:

> 4.     On November 2, 2005, Plaintiffs' [*sic*] filed their Complaint in the Circuit Court of St. Clair County (Alabama).  Mead accepted service on November 15, 2005.  (See letter attached as Exhibit A.)

---

[7] *See* doc. no. 1-1 (State Court Civil Action Cover Sheet and Complaint) ¶¶ 7, 12, 17. "Mesothelioma" is defined by a generally accepted medical dictionary as "a tumor derived from mesothelial tissue . . . .  Malignant varieties [*e.g.*, *pleural* mesothelioma] are often the result of excessive exposure to asbestos."  *Dorland's Illustrated Medical Dictionary* 1134 (30th ed. 2003) (alteration supplied).  "Pleural mesothelioma" is characterized by the same learned treatise as "a malignant mesothelioma of the pleural space, often spreading widely and invading other thoracic structures; . . . It is usually fatal within one year."  *Id*. at 1135.

[8] *See* doc. no. 1-3 (Notice of Removal).

[9] *Id*. at 1 (first para.) (emphasis supplied).  That same shorthand method of implying that the MeadWestvaco Corp. had acquired, merged with, or was a successor in interest to defendant The Mead Corp. ("Mead") was reiterated in MeadWestvaco Corp.'s subsequent motion for a stay of proceedings, and its answer to plaintiff's complaint.  *See* doc. no. 2 (Motion for a Stay Pending Transfer by the Judicial Panel on Multidistrict Litigation), at 1; and doc. no. 11 (Answer of Defendant MeadWestvaco Corp. to Plaintiffs' [*sic*] Original Complaint), at 1.

[10] Doc. no. 1-3 (Notice of Removal) ¶ 1 (quoting 42 U.S.C. § 113(b), now recodified as § 9613(b)).

Paragraphs fifty-eight and fifty-nine of Plaintiffs' Complaint state:

> 58. Pursuant to 42 U.S.C. § 7412(b)(1), asbestos is a hazardous air pollutant, and is therefore a "hazardous substance" as defined by Section 101(14) of U.S.C. § 9601 (14).

> 59. Within the community of Ragland Alabama, there exists a pipeline connecting residences and local businesses to various utilities. The pipeline existing in Ragland, Alabama is a "facility" with the meaning of Section 101 (9) of CERCLA, 42 U.S.C. § 9601(9). This pipeline is composed of asbestos and asbestos products sold/manufactured by the Defendants.

(Complaint, Attached as Exhibit "B")

5. Paragraphs fifty-eight and fifty-nine of Plaintiffs' Complaint are drafted so as to expressly state a claim under federal law. Plaintiffs' claims thus fall within the original jurisdiction of the district courts.[11]

Notwithstanding those statements, all counts of the complaint clearly were premised upon state-law theories of recovery.[12]

---

[11] *Id.* ¶¶ 4–5.

[12] The theories of recovery undergirding the claims were stated as follows: the "Alabama Extended Manufacturer's Liability Doctrine Against Defendant Manufacturers, Distributors, Sellers and/or Users of Asbestos Containing Materials" (Count One); "Negligence" (Count Two); "Conspiracy" (Count Three); "Gross Negligence, Wilful, Wanton and Intentional Wrongful Conduct" (Count Four); "Gross Negligence of Defendants Mead, MeadWestvaco and National Cement" (Count Five); "Negligent Inspection, Negligent Undertaking by MeadWestvaco Corporation, as successor by merger to Mead Corporation, individually, and as successor in interest to Woodward Iron Company" (Count Six); "Negligent Use, Production, Storage, Release and Disposal of Hazardous Waste Products of Defendant Mead and Defendant MeadWestvaco" (Count Seven); "Public Nuisance" (Count Eight); "Trespass" (Count Nine); "Tort of Outrage" (Count Ten); "Battery" (Count Eleven); "Intentional Infliction of Emotional Distress" (Count Twelve); "Negligent Infliction of Emotional Distress" (Count Thirteen); "Alabama Code § 7-2-314 Breach of Warranty"

For such reasons, plaintiff's counsel quickly filed an "Emergency Joint Motion" asking this court to remand the case to state court, as well as to permit counsel to perpetuate the testimony of Alford McGuffie in the present case, and Charles Richard Archer in the companion case of *Archer vs. Mead Corporation, et al.*, Civil Action No. CV-05-S-2466-M (N.D. Ala.), based upon the allegation that both men were near death from mesothelioma.[13]  With regard to the issue of remand, counsel argued that MeadWestvaco's notice of removal

> was improper as to both Plaintiffs because:  (a) notice was never received by plaintiffs' counsel; (b) plaintiffs' counsel believes the cases were removed on defense counsels' assertion that the case contains allegations under CERCLA.  However, on its face, the Complaints contain no CERCLA count, and thus were improperly removed.  Even, *assuming arguendo*, that the complaint did contain a CERCLA [count], it would still be an improper basis upon which to remove the case to federal court.[14]

This court permitted counsel to schedule video depositions on days, and at times and places, permitted by the physicians providing treatment to Messrs. McGuffie and Archer, as well as the administrators of the hospital in which they were housed, but held that aspect of their joint motion seeking remand in abeyance, pending

---

(Count Fourteen); "Second Restatement § 402 A Strict Liability" (Count Fifteen); "Fraudulent Suppression" (Count Sixteen); and, "Loss of Consortium" (Count Seventeen).  Doc. no. 1-1 (State Court Civil Action Cover Sheet and Complaint), at 9–36.

[13] *See* doc. no. 3, at 1–2.

[14] *Id*. at 2 (grammatical errors and emphasis in original, alteration supplied).

compliance with a briefing schedule addressing that issue.[15]

Before the remand question became ripe for decision, however, the case was transferred on or about January 24, 2006, to the Eastern District of Pennsylvania ("the MDL court") by the Judicial Panel on Multidistrict Litigation ("the MDL Panel"), for the purpose of promoting coordinated and consolidated pretrial proceedings among thousands of similar actions.[16]   Accordingly, this court heard nothing more of plaintiff's claims until sometime after September 16, 2011, when the remnants of the prior action were remanded by the MDL Panel.[17]

A summary of pertinent proceedings conducted in the MDL court is found in

---

[15] *See* doc. no. 4, at 3–4.

[16] *See* doc. no. 65 (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order (CTO-257)), at 1–2 (observing that, on July 29, 1991, the MDL Panel "transferred a total of 26,639 asbestos cases to the United States District Court for the Eastern District of Pennsylvania for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, and the Asbestos Products Liability Litigation, MDL Docket No. 875, (hereinafter 'MDL 875') was created," (citing *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415, 424–25 (J.P.M.L. 1991), and, on January 24, 2006, the same Panel "issued CTO-275 conditionally transferring [the *Archer* and *McGuffie* actions] (along with [99] other actions) to MDL 875 . . . ." (alterations supplied)).

[17] Judge Eduardo C. Robreno of the MDL court entered a Conditional Remand Order (entitled "Suggestion of Remand") on Aug. 10, 2011, proposing that this action be remanded to the Northern District of Alabama, but allowing the parties a period of time within which to determine whether they would consent to a trial in the Eastern District of Pennsylvania. *See* doc. no. 120-53 (E. D. Pa. doc. no. 123).  Defendants initially filed a notice of their opposition to the proposed remand.  The following month, however, defendants withdrew their opposition, and the MDL Panel entered an order lifting the stay on the Conditional Remand Order, and remanded the action to the Northern District of Alabama. *See* doc. no. 99 ("Order Lifting Stay of Conditional Remand Order," entered Sept. 12, 2011 as E. D. Pa. doc. no. 129), at 1.  That order was docketed in this court on Sept. 16, 2011.  *Id.*

the following parts of the brief submitted by MW Custom Papers, LLC ("MW"):[18]

      4.    On March 2, 2010, MW filed its first Motion for Summary Judgment based on Alabama's shareholder immunity defense and the Alabama Supreme Court's holding in *Henderson v. MeadWestvaco*, 23 So. 3d 625 (Ala. 2009), which applied Alabama's one year from the date of last exposure statute of limitations applicable to pre-1979 asbestos exposures to the wrongful death claims of a former CAPCO worker under similar facts.  (E. Dist. Pa. Docket Entry 7).

      5.    On August 13, 2010, the MDL court granted MW's Motion for Summary Judgment based on Alabama's shareholder immunity defense, and thus did not address MW's other bases for summary judgment.  (E. Dist. Pa. Docket Entry 32).

      6.    On August 23, 2010, Plaintiff filed a Motion for Reconsideration asking the MDL court to vacate its order granting summary judgment and order MW to respond to Plaintiff's discovery requests.  (E. Dist. Pa. Docket Entry 34).

      7.    On January 14, 2011, the MDL court granted Plaintiff's Motion for Reconsideration, denied MW's motions for summary judgment without prejudice, and required MW to respond to Plaintiff's discovery requests.  (E. Dist. Pa. Docket Entry 75).

      8.    MW filed a Renewed Motion for Summary Judgment on March 15, 2011, based on Alabama's shareholder immunity defense and Alabama's pre-1979 statute of limitations for asbestos exposure cases. (E. Dist. Pa. Docket Entry 79).

      9.    On April 28, 2011, Plaintiff Iris McGuffie filed a Suggestion of Death and Motion to Substitute Proper Party, notifying the MDL court that Mr. McGuffie passed away on January 23, 2006, and requesting that she be substituted as Personal Representative of his estate.  (E. Dist. Pa. Docket Entry 92).

---

[18] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment); *see also* doc. no. 105 (same).

10.    On July 29, 2011, the MDL court issued its Order addressing MW's Renewed Motion for Summary Judgment. (E. Dist. Pa. Docket Entry 121, 122).  The court found that "Plaintiffs' claims are not [barred by the pre-1979 exposure rule], as they have presented evidence that may show post-1979 exposure." (E. Dist. Pa. Docket Entry 121 at p. 19). The MDL court found that MW was entitled to summary judgment on Plaintiff's theories of liability based on product liability, voluntary assumption of the workplace safety obligations of CAPCO, and premises liability claims relating to exposures that allegedly occurred at Mead-owned dumpsites. *Id*.  However, the MDL court allowed Plaintiff's negligent safety inspection claim to stand. *Id*.

11.    On August 11, 2011, the MDL court issued an Order to the Clerk for the United States Judicial Panel on Multidistrict Litigation, suggesting that this case be remanded back to this Court "for resolution of all matters pending within this case except punitive damages." (E. Dist. Pa. Docket Entry 123).

12.    MW filed a Motion for Reconsideration on August 12, 2011, which was denied by the MDL court on August 31, 2011. (E. Dist. Pa. Docket Entry 124, 127).  In denying the Motion, the MDL court failed to substantively address whether, applying the post-1979 "discovery rule" statute of limitations, the instant claims were time barred because of Mr. McGuffie's 1996 lawsuit that alleged personal injuries as a result of asbestos exposure at the CAPCO plant.

13.    On September 7, 2011, the MDL court granted Plaintiff's motion to substitute Iris McGuffie as the proper party to represent the Estate of Alford McGuffie.  (E. Dist. Pa. Docket Entry 128).

14.    On September 16, 2011, the Clerk of the Judicial Panel on Multidistrict Litigation issued an order remanding the case from the MDL and reopening it in this Court.  (Doc. 99).

15.    Following remand to this Court, the parties jointly designated documents from the Eastern District of Pennsylvania's docket for inclusion in the files to be remanded to the Northern District of Alabama on October 14, 2011, pursuant to Rule 10.4(a) of the Rules

of Procedure of the Judicial Panel on Multidistrict Litigation.  (E. Dist. Pa. Docket Entry 130).[19]

According to the MDL Panel's remand order, the only claim that remains pending in this once sprawling suit against numerous defendants is an allegation that The Mead Corporation voluntarily undertook a duty to conduct safety inspections at the CAPCO plant, but did so negligently,[20] *asserted against MeadWestvaco* (the corporate successor to The Mead Corporation).[21]  Of course, such a claim is based upon state law.  Nevertheless, the MDL court expressly noted that it possessed

> supplemental jurisdiction over Plaintiffs' non-CERCLA state law claims pursuant to 28 U.S.C. § 1367.  Alabama law applies to the state-law claims at issue.  See Felder v. Casey, 487 U.S. 131, 151 ("Under Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), when a federal court exercises diversity or pendent jurisdiction over state-law claims, 'the outcome of the litigation should be substantially the same . . . as it would be if tried

---

[19] Doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 4–7 (footnote omitted); *see also* doc. no. 105, at 4–7 (same).  It should be noted that, even though the MDL Panel's order of remand was docketed in this court on September 16, 2011, the record from the United States District Court for the Eastern District of Pennsylvania was not returned until more than a year later, *i.e.*, on or about October 5, 2012.  *See* doc. nos. 119 and 120 (Oct. 5, 2012 Notice of Filing Record on Remand from MDL 875).

[20] *See* doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 16 ("Mead voluntarily undertook inspections of CAPCO, and there remains a genuine issue of material fact as to whether Mead did so negligently."), and 19 ("Mead is entitled to summary judgment on all of Plaintiffs' claims except that Mead voluntarily undertook a duty to inspect the premises, and did so negligently."); *see also* doc. no. 120-51, at 16, 19 (same).

[21] *See* doc. no. 120-53 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 11, 2011 as E. D. Pa. doc. no. 123), at 2 ("The remaining viable Defendants [*sic*] in this case to be pursued at trial is:  Meadwestvaco [*sic*] Corporation."), and doc. no. 120-52 (Order denying MeadWestvaco Corp.'s motion for summary judgment, entered Jul 28, 2011 as E. D. Pa. doc. no. 122).

in federal court.'").[22]

# I

During 1963, the Woodward Iron Company ("Woodward") and the American Smelting and Refining Company ("Asarco") entered into an agreement to construct a cement asbestos pipe production facility in Ragland, Alabama, to be jointly operated under the name of The Cement Asbestos Products Company ("CAPCO").[23]

> Woodward was already in the pipe business, and wanted to "expand its manufacturing to include the production and sale of cement asbestos products, especially cement asbestos pipe." Asarco was to supply the asbestos, via its subsidiary Lake Asbestos of Quebec, Ltd. The division of the ownership of the plant was 60% Woodward / 40% Asarco. The agreement provided that[, even though] CAPCO "will be operated as a self-sufficient entity, the parties recognize that CAPCO can be operated with substantially greater economy and efficiency if Woodward will supply direct management supervision on a <u>consultant</u> basis, which it is willing to do . . . ." Generally, "the affairs of CAPCO will be under the general management of the board of directors of six individuals, of whom three will always be designated by Asarco[, despite its minority

---

[22] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 3; *see also* doc. no. 120-51, at 3 (same). This court would not have been so charitable. *See, e.g.*, *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."). The case is here, however, and it has been pending since 2005. Accordingly, it compels decision, even though this court is asked in Part IV.A, *infra*, to express an opinion on how Alabama courts would determine an issue of first impression in the State.

[23] *See* doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 11; *see also* doc. no. 120-51, at 11 (same); doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 24; doc. no. 115-6 (Woodward/Asarco Agreement, June 24, 1963), at ECF 2–3.

stock position].”[24]

The CAPCO plant manufactured pipes from a combination of asbestos, cement, silica, and water.  Raw asbestos was delivered to the plant in bags that were opened by employees, such as Alford McGuffie,[25] and

> mixed with cement and silica into a "slurry," and then rolled into pipe form.  About 6,000 tons of asbestos were used per year in the manufacturing process at CAPCO.  There is testimony in the record that the worksite was consistently very dusty[, and that airborne asbestos fibers ("dust") were visible "everywhere" within the plant].[26]

Woodward and The Mead Corporation ("Mead") entered into a merger agreement on November 30, 1968, under the terms of which "Mead, as the surviving corporation, took over 'all the rights, privileges, immunities, powers, franchises, and authority' of Woodward."[27]  As a result of that merger, Mead also acquired an

---

[24] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 11 (citations omitted, alterations supplied, emphasis in original); *see also* doc. no. 120-51, at 11 (same).  Woodward and Asarco executed an amendment to their original agreement on August 8, 1968, and Woodward's interest in the facility was reduced to 51 percent of the outstanding shares of stock, while Asarco's interest was increased to 49 percent.  *See* doc. no. 115-9 (Woodward/CAPCO/Asarco Amendment to Agreement, Aug. 8, 1968) ¶ 1.  Even after that amendment, Woodward retained a majority interest in the joint venture.

[25] Alford McGuffie "was responsible for opening bags of asbestos, unloading them, and cleanup."  Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 4; *see also* doc. no. 120-51, at 4 (same); doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 45.

[26] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 2 (citations omitted, alteration supplied); *see also* doc. no. 120-51, at 2 (same).

[27] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 12 (citation omitted, alteration supplied); *see also* doc. no. 120-51, at 12 (same).

11

ownership interest in another entity located in Ragland, Alabama, known as The

National Cement Company.[28]

> Both prior to and after the merger, Woodward, and then Mead, employed a Director of Safety, Stanley Mooney. Mooney performed safety inspections twice a month, would talk about any unsafe practices with employees, and would send a written report regarding his inspection. Under these circumstances, it is apparent that there was a corporate relationship between CAPCO and Mead that involved safety consulting.[29]

Sometime during that same year of 1968, Alford Ray McGuffie began working

at the CAPCO plant, and he was employed there — initially as a laborer, later as a

clerk, and finally as a labor foreman — until the date in 1982 on which the facility

closed. However, Mead's involvement in the operations of the CAPCO plant ended

about eight years before the facility was closed: *i.e.*, on September 30, 1974, when

Mead sold its majority interest in the joint venture to Asarco.[30]  "In addition to the

---

[28] Doc. no. 119-44 (Memorandum Opinion entered on Aug. 12, 2010 as E.D. Pa. doc. no. 32, and granting the motion for summary judgment of defendant MW Custom Papers, LLC), at 2 n.1, *rev'd by* doc. no. 120-8 (Order entered Jan. 14, 2011 as E.D. Pa. doc. no. 75, and granting plaintiff's motion for reconsideration).

[29] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 12 (citation omitted); *see also* doc. no. 120-51, at 12 (same). Even though the Director of Safety identified numerous safety problems in recommendations submitted to management, plaintiff contends that Mead never conducted any "dust counts" in the plant, and that no affirmative steps were taken to reduce the concentration (quantity) of airborne asbestos fibers in the environment of, or improve the safety of working conditions within, the CAPCO plant. *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶¶ 31–40.

[30] *Compare* doc. no. 119-44 (Memorandum Opinion entered on Aug. 12, 2010 as E.D. Pa. doc. no. 32, and granting the motion for summary judgment of "Defendant MW Custom Papers, LLC"), at 2 n.1 ("As a result of the merger [of Mead and Woodward], Mead also acquired an ownership interest in National Cement. Mead divested its ownership interests in National Cement

unsatisfactory performance at the plant, Mead cited the 'adverse development[]' of 'asbestos related cancer publicity' [as one of the reasons for divesting its interest in CAPCO and The National Cement Company]."[31]

Thus, plaintiff's remaining claim against MeadWestvaco and/or MW Custom Papers, LLC, as successors-in-interest to The Mead Corporation, and based upon Alford McGuffie's employment at the CAPCO plant, is limited to events that occurred during the period from 1968 to September 30, 1974: in other words, the first six of the fourteen years that Alford McGuffie worked in that facility.

## II

It is important to note that the present action was not the first suit filed by Alford McGuffie that addressed his exposure to airborne asbestos fibers in the

---

on March 15, 1974[,] and CAPCO on September 30, 1974.") (alterations supplied, citations omitted) *with* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 41 (where plaintiff argues that Mead sold the CAPCO plant to Vicat, a French company, on Feb. 22, 1974). Contrary to plaintiff's assertions, the cited agreement between Mead and Vicat references only the National Cement plant, not the CAPCO plant. *See* doc. no. 115-41 (Mead Corp./Vicat Agreement, Mar. 15, 1974), at 1. An agreement between Mead and Asarco that was submitted, but not cited, by plaintiff indicates instead that Mead sold all of its CAPCO shares and notes to Asarco on Sept. 30, 1974. *See* doc. no. 115-36 (Excerpts from Mead Corp./Asarco Agreement Regarding CAPCO Sale, Sept. 30, 1974), at ECF 4. The sale of CAPCO to Asarco is further supported by a summary of a Mead Executive Committee Meeting that occurred on Sept. 26, 1974, approving the sale of CAPCO to Asarco (and referencing the sale of National Cement to Vicat earlier in the year). *See* doc. no. 115-12 (Mead Corp. Executive Committee Meeting Regarding CAPCO Sale, Sept. 26, 1974), at ECF 2, 4. All evidence, therefore, points to Mead divesting itself of CAPCO on September 30, 1974, rather than February 22 of the same year, and to Asarco, not Vicat.

[31] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 14 (first alteration in original, second alteration supplied, citation omitted); *see also* doc. no. 120-51, at 14 (same); doc. no. 115-12 (Mead Corp. Executive Committee Meeting Regarding CAPCO Sale, Sept. 26, 1974), at ECF 3.

CAPCO plant.  He initially filed a suit during 1995 in the District Court of Jefferson

County, Texas, claiming, along with other plaintiffs, that he had developed asbestosis

as a result of his employment in that facility.[32]

The claims asserted in the Texas case were settled on September 19, 1995, in

return for the payment of the paltry sum of $150 to both McGuffies.[33]  As part of the

settlement, Alford and his wife jointly executed a "Pro Tanto Release and Indemnity"

agreement, by the terms of which they released CAPCO and its "present and former

parents, subsidiaries, successors, predecessors . . . assigns . . . and stockholders

. . . ."[34]  Pertinent portions of that document read as follows:

> That we, the undersigned, and in consideration of the sum of Ten
> Dollars and other good and sufficient consideration paid, the receipt of
> which is hereby acknowledged, joined by our attorneys, hereby fully and
> finally RELEASE, ACQUIT and FOREVER DISCHARGE the
> RELEASEES [*sic*] and each of the RELEASEES' *present and former*
> *parents*, *subsidiaries*, *successors*, predecessors and assigns, their
> insurance carriers . . . and the present and former directors, officers,
> agents, servants, employees, principals, attorneys, representatives,
> receivers, and *stockholders* of all such corporations from any and all
> claims, demands, causes of action of whatsoever nature or character for
> asbestos-related disease or death which we may now have or hereafter
> have against the RELEASEES, including by example, but not limited to
> . . . *negligence*, gross negligence, . . . damages under Wrongful Death

[32] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of Summary Judgment), at 8, 11; *see also* doc. no. 105, at 8, 11 (same).

[33] During Mr. McGuffie's deposition in the present action, he sarcastically described that settlement amount as "Big money." Doc. no. 105-9 (Sept. 16, 1997 Deposition of Alford McGuffie, Part 2), at 113.

[34] Doc. no. 105-4 (Sept. 19, 1995 Pro Tanto Release and Indemnity Signed by Alford and Iris McGuffie) (emphasis supplied).

14

and Survival Statutes . . . and expenses of any type whatever, in any manner arising out of or in any way connected with, directly or indirectly, exposure or occurrences of injuries, disease, illness or death of the PLAINTIFF, as well as any consequence thereof, including loss of consortium and services and other damages to PLAINTIFF'S SPOUSE.

We intend that this is a full and final release as to the RELEASEES and each of the RELEASEES' present and former parents, subsidiaries, successors, predecessors and assigns, their insurance carriers . . . and the present and former directors, officers, agents, servants, employees, principals, attorneys, representatives, receivers, and stockholders of all such corporations. We intend that this is a "full and final release" of the RELEASEES as that term is used under Texas law, that the RELEASEES each be considered a "settling person" as that term is defined under § 33.011 of the Texas Civil Practice and Remedies Code, and that the RELEASEES be afforded the fullest possible protection from contribution and indemnity claims.

However, this release is not intended to discharge any other separately identified manufacturer, distributing employer, or premises owner. We intend only to release the RELEASEES and persons (such as employees and agents) sharing liability with them or through them and do not intend to release other persons or companies whose liability is independent of the RELEASEES whether presently or subsequently named as a defendant in litigation. We are only releasing the parties released herein and specifically reserve all rights against parties not released herein; on this basis and only for the express purpose of preserving our rights against parties not released herein, this release should be considered a "pro tanto release and indemnity" as that term is used under Alabama law.

We intend this release to be as broad and comprehensive as possible, so that the RELEASEES shall never be liable, directly or indirectly, to us or our beneficiaries, heirs, successors or assigns or any person, firm, or corporation claiming by, through, under or on behalf of us or them, for any claims, demands, actions or causes of action for asbestos-related personal injury or death of whatsoever nature or

character arising out of any injuries, disease, illness or death of PLAINTIFF, including, but not limited to, any claims, demands or causes of action that have been or may be asserted against the RELEASEES in other courts or forums.

We hereby declare and represent that the disease contracted or the injury received by the PLAINTIFF in any way connected with the use of or exposure to the RELEASEES' products is permanent and progressive, and that recovery therefrom is uncertain and indefinite, and may result in death. We further understand that such injuries or disease may be more serious in nature than they now appear and that hereafter they may become progressively worse. *We understand that the PLAINTIFF may be suffering from or may in the future suffer from asbestos-related diseases or other injuries (such as* cancer or *mesothelioma) connected with the use of or exposure to various insulating materials and other products manufactured, sold, specified, called for, distributed, or otherwise put in the stream of commerce by the RELEASEES, which have not manifested themselves at the present time.* We further fully understand that such injuries or disease may cause the PLAINTIFF to suffer pain and mental anguish for a long time in the future and that the PLAINTIFF may be caused to spend sums of money on doctor care, treatment, hospitalization and drugs. *It is our intention and agreement that any claims we have or may have for any such diseases or injuries prior to PLAINTIFF'S death*, *for PLAINTIFF'S death*, *and the consequences thereof are the subject of this release and are hereby released.*

It is the express intention of the parties to this release that the consideration stated herein fully and completely compensate and satisfy the undersigned for all asbestos-related injuries, disease, damages, expenses and all other claims against the RELEASEES released hereby. *The undersigned expressly contract that no claim or cause of action against the RELEASEES for asbestos-related personal injury or death is reserved.*

. . . .

16

>      *The RELEASEE herein is CAPCO.*  The RELEASEE is released
> by this single instrument purely for administrative convenience.[35]

On the same day that Alford and Iris McGuffie executed the foregoing release,

they also signed a similar document prepared by Asarco,[36] the entity that was solely

responsible for operating the CAPCO plant from September 30, 1974, when Mead

sold its interest in the facility to Asarco, until the plant was closed in 1982:  in other

words, the last eight years that Alford McGuffie worked in that facility.

Even though the Asarco release and indemnity agreement was not made a part

of the record presented to this court following remand, Alford McGuffie testified

during his deposition that he understood that he was releasing Asarco for the "[s]ame

thing as CAPCO."[37]

Nearly ten years after executing the foregoing release and indemnity

agreements (*i.e.*, during August of 2005), and approximately three months before

commencing the present action, Alford Ray McGuffie was diagnosed with

mesothelioma.[38]  He died on January 23, 2006.[39]

---

[35] Doc. no. 105-4 (Sept. 19, 1995 Pro Tanto Release and Indemnity Signed by Alford and Iris McGuffie) (emphasis supplied); *see also* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of Summary Judgment), at 16–20; doc. no. 105, at 16–20 (same).  During his deposition, Mr. McGuffie testified that his understanding of the foregoing agreement was that he was releasing CAPCO of "[t]heir responsibility as far as any further suits or anything like that."  Doc. no. 105-9 (Sept. 16, 1997 Deposition of Alford McGuffie, Part 2), at 112 (alteration supplied).

[36] Doc. no. 105-9 (Sept. 16, 1997 Deposition of Alford McGuffie, Part 2), at 114–15.

[37] *Id.* at 115 (alteration supplied).

[38] *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 11.

[39] *See* doc. no. 120-23 (Suggestion of Death and Motion to Substitute Proper Party).

**III**

The pleadings from the MDL court presented perplexing inconsistencies.  For example, that court entered an opinion on July 11, 2011 stating, in its first sentence, that it addressed "*Defendant **MW Custom Papers, LLC's** Motion for Summary Judgment.*"[40]   However, that declaration constitutes the only instance in the succeeding nineteen pages that MW Custom Papers, LLC, is described as the relevant, moving defendant.  Indeed, the first paragraph on the second page of the opinion provides that:

> Plaintiffs in the instant cases[41] have asserted claims based on alleged exposure to asbestos at the Cement Asbestos Products Company ("CAPCO") and National Cement plants in Ragland, Alabama.  It is undisputed that The Mead Corporation ("Mead")[,] as corporate predecessor *to named Defendant **MeadWestvaco Corporation***, was a shareholder of the above-mentioned plants from 1963 to 1974.[42]

Moreover, the concluding paragraph of the opinion, summarizing the court's holdings, reads as follows:

---

[40] *See* doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 1 (all emphasis supplied); *see also* doc. no. 120-51, at 1 (same).

[41] The use of the plural noun "cases" is not a mistake, but refers to the fact that the MDL court's opinion addressed motions for summary judgment filed by "*Defendant MW Custom Papers, LLC*" in three companion cases:  *i.e.*, *Richard Archer v. Mead Corporation, et al.*; *Alford McGuffie v. Mead Corporation, et al.*; and *Rebekkah Riggs v. Mead Corporation, et al.*

[42] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 2 (footnote, alteration, and emphasis supplied); *see also* doc. no. 120-51, at 2 (same).

18

Based on the foregoing, Plaintiffs' claims are not time-barred, as they have presented evidence that may show post-1979 exposure. However, *Mead* is entitled to summary judgment on all of Plaintiffs' claims except [for the claim] that *Mead* voluntarily undertook a duty to inspect the premises, and did so negligently.[43]

Finally, the MDL court's Conditional Remand Order,[44] made final by the MDL Panel on September 12, 2011,[45] confounded the confusion by stating that "[t]he *remaining viable Defendants* [*sic*] in this case to be pursued at trial is: *Meadwestvaco* [*sic*] *Corporation*."[46]

Such inconsistencies caused this court to ask counsel during oral argument: Which entity is the proper defendant to respond to plaintiff's remaining claim — The Mead Corporation, The MeadWestvaco Corporation, or MW Custom Papers, LLC?

**A**

---

[43] *Id.* at 19 (emphasis and alteration supplied).

[44] *See* doc. no. 120-53 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 10, 2011 as E.D. Pa. doc. no. 123).

[45] *See* doc. no. 99 (Order Lifting Stay of Conditional Remand Order entered Sept. 12, 2011 as E.D. Pa. doc. no. 129).

[46] Doc. no. 120-53 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 10, 2011 as E. D. Pa. doc. no. 123), at 2 (alterations and emphasis supplied). *See also* doc. no. 120-52 (Order denying MeadWestvaco Corp.'s Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 122).

MW Custom Papers, LLC, represents that it is the successor-in-interest to *both*

The Mead Corporation *and* MeadWestvaco Corporation.[47]  MeadWestvaco reiterated

that contention in its motion for summary judgment:

> 3.     On January 29, 2002, The Mead Corporation and Westvaco Corporation became wholly owned subsidiaries of MeadWestvaco Corporation through a stock-for-stock exchange merger.  Subsequent to the merger, The Mead Corporation was merged into a newly formed entity, MW Custom Papers, Inc., which was later converted into a limited liability company, MW Custom Papers, LLC, with MeadWestvaco as its sole member.  *See* [doc. no. 106-1, Declaration of Anthony Oliver, Vice President and Assistant Treasurer of MW Custom Papers, LLC,] at ¶ 4.

> 4.     MW Custom Papers, LLC <u>did not</u> assign to MeadWestvaco any liabilities pertaining to the Woodward Corporation or liabilities that might have arisen relating to The Mead Corporation's ownership in stock of The Cement Asbestos Products Company.  *Id*. at ¶ 5.

> 5.     Accordingly, MW Custom Papers, LLC, not MeadWestvaco Corporation, is the relevant successor to any liabilities that The Mead Corporation may have had pertaining to the allegations in this lawsuit.  MeadWestvaco's only connection to this matter is as the sole member of MW Custom Papers, LLC.  The proper defendant in this lawsuit is MW Custom Papers, LLC, not MeadWestvaco Corporation or The Mead Corporation.  *Id*. at ¶ 6.

---

[47] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 1 ("MW is now the sole remaining defendant . . . ."); *see also* doc. no. 105, at 1 (same).

> Plaintiffs have also included MW's parent company, MeadWestvaco Corporation, as a defendant in this action.  However, MeadWestvaco Corporation does not have the liabilities for The Mead Corporation and has filed a separate motion for summary judgment on that basis.

Doc. no. 104-1, *supra*, at 1 n.1; *see also* doc. no. 105, at 1 n.1 (same).

6.     As such, any and all claims asserted in this lawsuit against MeadWestvaco fail as a matter of law.

WHEREFORE, Defendant MeadWestvaco respectfully requests this Court to enter complete summary judgment in its favor and against Plaintiff.  In addition, MeadWestvaco requests the Court to enter an Order directing the Clerk's office to change the docket to reflect the sole reamining defendant in this action as "MW Custom Papers, LLC."[48]

## B

The parties filed a "Joint Status Report" on December 30, 2013, addressing this issue, but not resolving it.  On the one hand, the parties stipulated that MW Custom Papers "is *a* correct Defendant" (emphasis intentional) in this case, as well as the companion case, *Archer vs. Mead Corporation, et al*., Civil Action No. CV-05-S-2466-M (N.D. Ala.).  Specifically, the Joint Status Report states that:

1.     The parties agree that MW, as successor in interest to Mead [The Mead Corporation], *is a correct Defendant* in both cases. Although MW was formally added by amendment only in the *Archer* case, MW voluntarily appeared as a party in numerous pleadings in both cases while this action was pending in the MDL and took the position that it, rather than its parent company, MeadWestvaco, was the proper defendant for the liabilities of Mead.

2.     Rule 21 of the Federal Rules of Civil Procedure provides "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."

3.     The parties agree that no party will be prejudiced by the Court's adding of MW as a defendant in both cases, in place of the

---

[48] Doc. no. 106 (MeadWestvaco Corp.'s Motion for Summary Judgment), at 2–3 (alteration supplied, emphasis in original, footnote omitted); *see also* doc. no. 105-2 (Declaration of Anthony Oliver in Support of Renewed Motion for Summary Judgment); doc. no. 106-1 (same).

defendant originally identified as Mead. *See Nat'l Maritime Union of Am. v. Curran*, 87 F. Supp. 423, 426 (S.D.N.Y. 1949) ("[That Rule 21 may be used to substitute parties] . . . is the wiser answer to the problem of expediting trials and avoiding the unnecessary delay and expense of requiring an action to be started anew where a substitution is desired though the subject matter of the actions remains identical."); *see also* 7 Wright, Miller & Kane, *Federal Practice and Procedure*: *Civil 2d* § 1686, p. 463 (2d ed. 1986) ("[T]here is no reason why a substitution of parties cannot be made under Rule 21, in the discretion of the court and in the interest of justice, in situations not covered by Rule 25.").

4.      The parties agree and stipulate that it is not necessary for Plaintiffs to re-plead their claims against MW or to serve separate process on MW and that all prior claims asserted against either Mead or MeadWestvaco are deemed to have been asserted against MW and relate back to the original filing of the complaints in these actions.  Likewise, prior pleadings and discovery responses submitted in the name of either MW, Mead, or MeadWestvaco, shall be deemed to have been made by MW, so that no re-pleading is required to effectuate this substitution.[49]

On the other hand, the parties could not not agree on the question of whether

MW Custom Papers, LLC, should be viewed as the *only party* responsible for any

liabilities that either Mead or MeadWestvaco may have incurred as a result of

environmental conditions in the CAPCO plant during the period prior to the date on

which Mead sold its entire interest in the facility to Asarco:

5.      The parties disagree with respect to whether MW's sole member, MeadWestvaco Corporation, should also remain a defendant in either case.  Defendant's position is that MeadWestvaco Corporation is not a proper defendant and should be dismissed.  MeadWestvaco Corporation has a pending summary judgment motion regarding this issue (Doc. No. 115 in *Archer*, and Doc. No. 106 in *McGuffie*).

---

[49] Doc. no. 129 (Joint Status Report) at 2–3 (first alteration and emphasis supplied).

Plaintiffs disagree with this position and have filed oppositions to MeadWestvaco Corporation's summary judgment motions (Doc. No. 122 in *Archer*, and Doc. No. 111 in *McGuffie*).

6. As the parties cannot reach agreement on this issue, they are content to allow the Court to rule on the pending motions and responses as to whether MeadWestvaco Corporation will remain a defendant in these actions. Plaintiffs have recently received unverified discovery responses from MeadWestvaco Corporation, and have been promised the verification page on or before January 8, 2014. Plaintiffs request until January 20, 2014, to submit a short supplemental response in opposition to MeadWestvaco Corporation's summary judgment motion.

7. Consequently, *the parties jointly request entry of an Order establishing that the current defendants in this action are* MW Custom Papers, LLC, as successor in interest to The Mead Corporation, and MeadWestvaco Corporation, prior to ruling on the pending motions in this action.[50]

In accordance with the joint request stated in paragraph number 7 above, this court entered an order directing the Clerk "to add MW Custom Papers, LLC, as successor-in-interest to The Mead Corporation, as a defendant in these cases."[51]

## C

---

[50] *Id*. at 3–4 (emphasis supplied).

[51] Doc. no. 130 (Order entered in both the present action and *Archer v. Mead Corporation, et al*., Civil Action No. CV-05-S-2466-M (N.D. Ala.)), at 1. That order further stated that "all pleadings and discovery responses previously filed or submitted by MW Custom Papers, LLC, The Mead Corporation, or MeadWestvaco Corporation are deemed adopted and incorporated by MW Custom Papers, LLC, without the necessity of MW Custom Papers, LLC re-pleading in either case." *Id.* at 1–2.

Anthony Oliver, the Vice President and Assistant Treasurer of MW Custom Papers, LLC, prepared a Declaration that attempts to explain the historical origins of the various entities.  The relevant portions of that pleading read as follows:

> 2.     I have reviewed available materials pertaining to Mead's merger with Woodward Corporation and its resulting ownership of stock in the Cement Asbestos Products Company.  I have also reviewed historic documents discussed herein relating to Mead's divisions, National Cement Company and Murray Rubber Company, in order to enable me to make this declaration.  Because of the long passage of time since the transactions and events discussed herein occurred, MW must rely on the language of historic documents that its predecessor companies retained or that our legal counsel has been able to obtain through its investigation in order to set forth the facts below.  MW has no employees with personal knowledge relating to the historic events and transactions discussed herein involving Woodward Corporation, The Cement Asbestos Products Company, The National Cement Company, and Murray Rubber Company.

> **Relationship Between The Mead Corporation, MeadWestvaco Corporation, and MW Custom Papers, LLC**

> 3.     I have been informed by counsel that the named defendants in these lawsuits are "Mead Corporation" and "MeadWestvaco Corporation" and that Plaintiffs' claims in the lawsuits all involve allegations regarding Mead and its predecessor, Woodward Corporation.

> 4.     On January 29, 2002, Mead and Westvaco Corporation became wholly owned subsidiaries of MeadWestvaco Corporation through a stock-for-stock exchange merger.  Subsequent to the merger, Mead was merged into a newly formed entity, MW Custom Papers, Inc., which was later converted into a limited liability company, MW Custom Papers, LLC.

> 5.     MW assigned certain assets and liabilities of the former Mead Corporation to MeadWestvaco Corporation, *but not liabilities*

*pertaining to the Woodward Corporation or liabilities that might have arisen relating to Mead's ownership in stock of The Cement Asbestos Products Company* ["CAPCO"].

6.   MW is a wholly owned subsidiary of MeadWestvaco Corporation and is the successor to any liabilities that Mead may have had pertaining to the allegations in these lawsuits.  Therefore, the proper defendant in these lawsuits is MW Custom Papers, LLC, not MeadWestvaco Corporation or the Mead Corporation.[52]

## D

Plaintiff generally denies that MW Custom Papers, LLC, is the only proper defendant, but offers no substantive evidence to rebut the declaration of Anthony Oliver.  Instead, plaintiff attempts to discredit Oliver, saying that he was not a designated witness.[53]  Plaintiff's argument is not persuasive.  Anthony Oliver was designated as a witness under Federal Rule of Civil Procedure 30(b)(6), which permits a corporation to designate an officer who consents to testify on its behalf, and allows the corporation to "set out the matters on which each person designated will testify."[54]  Fed. R. Civ. P. 30(b)(6).  Anthony Oliver appeared at his deposition as

---

[52] Doc. no. 105-2 (Declaration of Anthony Oliver in Support of Renewed Motion for Summary Judgment), ¶¶ 3–6 (alterations and emphasis supplied); *see also* doc. no. 106-1, ¶¶ 3–6 (same).

[53] *See* doc. no. 111-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Response in Opposition to Defendant MeadWestvaco Corp.'s Motion for Summary Judgment), ¶¶ 6–7, 10–11; *see also* doc. no. 107-1 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Motion to Strike and Objection to Defendants' Motions for Summary Judgment), ¶ 34.  Plaintiff also generally argues that Anthony Oliver's declaration lacks credibility, as a prior deposition given by Oliver was inconsistent with a prior sworn affidavit of the same witness.  *See id.*  Plaintiff does *not* allege, however, that any part of Oliver's declaration is inconsistent with a prior affidavit or deposition.

[54] *See* doc. no. 107-1 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Motion

such a witness, for the purpose of answering questions related to, among other matters, the corporate structure of defendants.  He thus was presented for a proper purpose, and provided a declaration consistent with the purpose for which he was offered.

Further, plaintiff does not point to any substantive contradictions in the witness's testimony regarding the corporate posture of defendants; in fact, plaintiff recites the witness's explanation of the status of the Mead Corporation, MeadWestvaco, and MW Custom Papers, LLC, as an undisputed fact.[55]

Instead, plaintiff contends that MeadWestvaco failed to respond to material discovery requests; and, thus, plaintiff is not able to present facts in opposition to MeadWestvaco's motion.[56]  In response, MeadWestvaco argues that it, *in effect*, responded to plaintiff's discovery request:  *that is*, *MW Custom Papers, LLC, responded* to plaintiff's discovery requests; and, rather than submit the same responses twice (once as MW Custom Papers, LLC, and again as MeadWestvaco), defense counsel chose to respond only once, as MW Custom Papers, LLC.[57]  In

---

to Strike and Objection to Defendants' Motions for Summary Judgment), ¶¶ 27–28.

[55] *See* doc. no. 111-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Response in Opposition to Defendant MeadWestvaco Corp.'s Motion for Summary Judgment), ¶¶ 6–7.

[56] *See id.* ¶ 13.  Pursuant to Federal Rule of Procedure 56(d), plaintiff's counsel did provide an affidavit alleging that he cannot present facts essential to justify plaintiff's opposition to defendant's summary judgment motion, although plaintiff's counsel mistakenly references Federal Rule of Civil Procedure 56(f) as the applicable rule.  *See* doc. no. 111-7 (Exhibit 5, Rule 56(f) Affidavit), at ECF 1–2.

[57] *See* doc. no. 114 (MeadWestvaco Corp.'s Reply in Support of its Motion for Summary

support, MeadWestvaco includes as an evidentiary submission the responses of MW Custom Papers, LLC, to plaintiff's interrogatories, in which MW Custom Papers asserts, consistently with the contention of MeadWestvaco, that MW Custom Papers is the only proper defendant.[58]

## E

In addition to the Declaration of Anthony Oliver referenced in Part III.C above, a new piece of evidence regarding the corporate relationship between MW Custom Papers, LLC, and MeadWestvaco was made available to this court on January 27, 2014, in the form of a copy of the "Bill of Sale, Assignment and Distribution Agreement" executed by MW Custom Papers, LLC, on December 31, 2002.[59] Under the terms of that agreement, MW Custom Papers transferred to MeadWestvaco all "assets of every kind and nature whatsoever" ("the Distributed Assets"),[60] together with "all of the liabilities and obligations of every kind and nature whatsoever, contingent or otherwise, associated with the Distributed Assets,"[61] *except for* the assets and liabilities of "Divested Facilities": *that is,* "any facilities, real property,

---

Judgment), ¶ 3.

[58] *See* doc. no. 114-2 (MW Custom Papers, LLC's Response to Plaintiff's First Interrogatories), at ECF 6–8.

[59] *See* doc. no. 132-4 (Bill of Sale, Assignment and Distribution Agreement, and Jan. 14, 2014 Cover Letter), at ECF 4–8.

[60] *Id*. at ECF 4, ¶ 1.

[61] *Id*. ¶ 2.

businesses or operations, or any part thereof, that have been conveyed to third parties

prior to the Effective Time [*i.e*., December 31, 2002], or that have been terminated,

shut down or closed prior to the Effective Time . . . ."[62]  As to the assets and liabilities

of such "Divested Facilities," it was

> expressly agreed that any reserves maintained or insurance coverage or
> claims relating to any of these shall be specifically excluded from the
> Distributed Assets and shall remain available for the benefit of
> Distributor [*i.e*., MW Custom Papers, LLC], regardless of where booked
> on the balance sheet of any affiliate of Distributor.[63]

Both the CAPCO and National Cement plants had been conveyed to third parties

prior to "the Effective Time" of December 31, 2002.[64]  Thus, both constituted

"Divested Facilities" under the terms of the "Bill of Sale, Assignment and

Distribution Agreement."  Consequently, any claims and liabilities related to the

operation of either the CAPCO plant or National Cement facility were retained by

MW Custom Papers, LLC.

## F

Ultimately, defendant MeadWestvaco has provided evidence in the form of a

declaration by a corporate representative supporting its contention that it is not the

proper party in this action, and that contention is further supported by the Bill of Sale

---

[62] *Id*. at ECF 5, ¶ 5.

[63] *Id*. (alterations supplied).

[64] That is, CAPCO was sold to Asarco, and National Cement conveyed to Vicat.  *See supra* note 30.

Agreement. Plaintiff, on the other hand, has failed to present any substantive rebuttal evidence designating specific facts showing a genuine issue for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (requiring the nonmoving party in a motion for summary judgment to go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial).

Thus, in light of the Bill of Sale Agreement, combined with the Declaration of Anthony Oliver, and in the absence of substantive evidence to the contrary, this court concludes that there is no genuine issue of material fact concerning the question of whether MW Custom Papers, LLC, retains sole liability for claims relating to The Mead Corporation's former majority interest in the CAPCO plant. Accordingly, MeadWestvaco's Motion for Summary Judgment is due to be granted.[65]

## IV

The sole claim remanded to this court is a contention that, during the period that The Mead Corporation ("Mead") held a majority of the shares of stock in the corporate joint venture known as "The Cement Asbestos Products Company," Mead

---

[65] Though Iris McGuffie contends that "it is not clear that the transfer back to Meadwestvaco excludes the contractual and voluntary inspection services provided at CAPCO by Mead Corporation and its Woodward Division," and further that "[i]t also is not clear whether the document attempts or does in fact leave MW Custom Papers LLC lawfully responsible for the asbestos fibers and pipe carried, vented, and dumped outside CAPCO and National Cement," these bare assertions of ambiguity, without more, are not sufficient to create a genuine issue of material fact. Doc. no. 132 (Plaintiffs' [*sic*] Supplemental Memorandum in Opposition to MeadWestvaco Corp.'s Motion for Summary Judgment), at 3–4 (alterations supplied).

voluntarily assumed a duty to conduct safety inspections in the CAPCO plant, but performed that function negligently.[66]  The MDL court essentially held that, even though that theory raised significant issues of proximate causation, a jury *possibly could* determine that a negligent inspection of the CAPCO plant was conducted by Mead *prior to September 30, 1974* — the date on which, as discussed in Part I, at note 30, *supra*, Mead sold its entire interest in the CAPCO plant to Asarco — and that such negligence *could have* resulted in Alford McGuffie's exposure to asbestos *after May 19, 1980*, the effective date of those amendments to Alabama's statute of limitations that are discussed below (*in other words*, nearly six years after Mead had divested itself of any interest in the CAPCO plant).  The specific passage from the MDL court's opinion reads as follows:

> The Court notes that Mead's lack of involvement at the worksites after 1974 may be relevant on the issue of proximate cause.  To be held liable under a negligent inspection theory, a plaintiff must show that a defendant (1) undertook inspections (2) did so negligently and (3) "that such negligence was the proximate cause of his injuries."  *Glover v. Silent Hoist & Crane Co., Inc.*, 471 F. Supp. 457, 459 (N.D. Ala. 1979) (finding that insurer's safety recommendations were not the proximate cause of plaintiff's injuries).  A jury may determine that the significant gap in time between Mead's actions and Plaintiffs' injuries renders the causal relationship too attenuated. However, Mead has not moved for summary judgment on proximate cause and, in any event, it is

---

[66] *See, e.g.*, doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 19 ("Mead is entitled to summary judgment on all of Plaintiff's claims except [the claim] that Mead voluntarily undertook a duty to inspect the premises, and did so negligently." (alteration supplied)); *see also* doc. no. 120-51, at 19 (same).

traditionally a question reserved for the jury under Alabama law. *See*, *e.g*, *Mobile Gas Serv. Corp. v. Robinson*, 20 So. 3d 770 (Ala. 2009) ("Ordinarily, it is a jury question whether consequences of an act are reasonably foreseeable . . . .").[67]

## A

The Alabama statute of limitations that generally applies to negligence claims provides that actions for personal injury must be filed not later than two years after the date of the injury giving rise to the cause of action. *See* Ala. Code § 6-2-38 (1975) (2005 Replacement Vol.) (establishing two years as the "catch-all" statute of limitations for personal injury claims not arising under contract);[68] *see also, e.g., Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("The statutory period of limitations for negligence actions, found at Ala. Code § 6-2-38, is two years from the date the injury occurred."); *Henson v. Celtic Life Insurance Co.,* 621 So. 2d 1268, 1274 (Ala. 1993) ("The statutory period of limitations for negligence and wantonness actions, found at Ala. Code 1975, § 6-2-38, is two years from the date the injury occurred.").

---

[67] Doc. no. 107-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011, as E.D. Pa. doc. no. 121), at 7–8 (footnote omitted); *see also* doc. no. 120-51, at 7–8 (same).

[68] The statute cited in text reads as follows:

(l) All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.

Ala. Code § 6-2-38 (1975) (2005 Replacement Vol.).

Even so, the statute of limitations for a personal injury caused by exposure to asbestos is different.  Such a cause of action accrues "on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action." Ala. Code § 6-2-30(b).[69]

Alford McGuffie was diagnosed with asbestosis in September of 1995.[70]  He filed a suit contemporaneous with that diagnosis in the District Court of Jefferson County, Texas.[71]  That action resulted in the *pro tanto* release quoted in Part II, *supra*.[72]

The following year, Alford McGuffie also became one of the plaintiffs in another action filed in the Circuit Court of Jefferson County, Alabama, and styled *Clarence E. Alverson, et al. v. William H. Beasley, et al.*, CV-96-00700 (Jan. 31, 1996).[73]  Thus, it is clear that Alford McGuffie was aware of an injury stemming from

---

[69] The statute cited in text reads as follows:

    (b)  A civil action for any injury to the person or rights of another resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action.  This subsection shall not apply to or affect in any way, actions referred to in Section 6-5-482.

Ala. Code. § 6-2-30(b) (1975) (2005 Replacement Vol.).

[70] *See* doc. no. 105-3 (Alford McGuffie's Responses to Defendant LAQ's Interrogatories in *Clarence E. Alverson. et al. v.William H. Beasley, et al.*, Civil Action No. CV-96-700 (Cir. Ct. Jefferson Cnty., Ala.)), at ECF 7.

[71] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 8-9; *see also* doc. no. 105, at 8–9 (same).

[72] *See id.* at 9.

[73] *See id.* at 9–10; *see also* doc. no. 105-6 (Complaint, *Clarence E. Alverson. et al. v.William*

asbestos exposure by 1995 and 1996.[74]  There is no genuine issue of material fact on that point, only an issue of law.

Iris McGuffie argues that, because the injury at issue in the present case is *mesothelioma*,[75] as distinguished from *asbestosis*,[76] and also because her deceased husband was not diagnosed with mesothelioma until 2005, and commenced the present suit within two years of *that* date, the claims are not time-barred.[77]  In other words, Iris McGuffie argues that this court should apply what has become known as the "two-injury rule" — a different limitations period applied to asbestos cases in some jurisdictions.[78]

Defendants understandably oppose extension of the two-injury rule to this case, They cite Alabama cases involving non-asbestos claims, and holding that the statute

---

*H. Beasley, et al.*, Civil Action No. CV-96-700 (Cir. Ct. Jefferson Cnty., Ala.)).

[74] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 23; *see also* doc. no. 105, at 23 (same).

[75] "Malignant mesothelioma" is defined by a generally accepted medical dictionary as "a malignant tumor of the pleura, peritoneum, or pericardium, appearing as broad sheets of cells; some regions contain spindle-shaped, sarcoma-like cells and others show adenomatous patterns.  Many of these tumors, particularly in the pleura and peritoneum, have been linked to excessive exposure to asbestos." *Dorland's Illustrated Medical Dictionary* 1134 (30th ed. 2003) (defining "malignant mesothelioma").

[76] The same, generally accepted treatise defines asbestosis as "a form of pneumoconiosis (silicatosis) caused by inhaling fibers of asbestos, marked by interstitial fibrosis of the lung varying in extent from minor involvement of the basal areas to extensive scarring; it is associated with pleural mesothelioma and bronchogenic carcinoma." *Dorland's Illustrated Medical Dictionary* 161 (30th ed. 2003) (defining "asbestosis").

[77] *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶¶ 11, 84.

[78] *See id.* ¶¶ 78–81.

of limitations for a tort claim begins to run from the moment a plaintiff suffers any injury, even if the plaintiff later suffers an additional injury of greater degree.[79]

The difficulty for this court lies in the fact that the Alabama Supreme Court has not yet addressed the precise issue presented.[80]   Thus, this court must attempt to predict how the Alabama Supreme Court is likely to rule.  *See, e.g.*, *Molinos Valle Del Cibao, C., por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) ("Where the highest court — in this case, the [Alabama] Supreme Court — has spoken on the topic, we follow its rule. Where that court has not spoken, however, we must predict how the highest court would decide this case.") (alteration supplied).

A common garden variety tort claim generally accrues under Alabama law as soon as a plaintiff is entitled to maintain an action — that is, when plaintiff is aware of the complained-of behavior, as well as the resulting injury, "regardless of whether the full amount of the damage is apparent at the time of the first legal injury." *Chandiwala v. Pate Construction Co.*, 889 So. 2d 540, 543 (Ala. 2004) (citations omitted); *see also Booker v. United American Insurance Co.*, 700 So. 2d 1333, 1339 (Ala. 1997) (same) (citation omitted).

> If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues

---

[79] *See* doc. no. 116 (MW Custom Papers, LLC's Reply Brief), at 6–10.

[80] *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 81; doc. no. 116 (MW Custom Papers, LLC's Reply Brief), at 9.

and the statute begins to run from the time the act is committed, be the actual damage [then apparent] however slight, and the statute will operate to bar a recovery not only for the present damages but for damages developing subsequently and not actionable at the time of the wrong done; *for in such a case the subsequent increase in the damages resulting gives no new cause of action. Nor does plaintiff's ignorance of the tort or injury*, at least if there is no fraudulent concealment by defendant, *postpone the running of the statute until the tort or injury is discovered*.

*Kelly v. Shropshire*, 199 Ala. 602, 604–05, 75 So. 291, 292 (1917) (alteration in original, emphasis supplied) (citing *McCalla v. Louisville & Nashville Railroad Co.*, 163 Ala. 107, 50 So. 971 (1909); *Snedicor v. Davis*, 17 Ala. 472 (1850); *Governor v. Gordon*, 15 Ala. 72 (1848); *Mardis Adr's v. Shackleford*, 4 Ala. 493 (1842)).  The fact that "other damages might follow . . . should not defeat the commencement of the running of the applicable statutory limitations period." *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 114 (Ala. 2003).

In contrast, several states have adopted a statute of limitations rule specifically tailored to asbestos cases, and recognize separate causes of action for separate disease-processes resulting from the same asbestos exposure, particularly when one disease manifests itself long before the other.  *See, e.g., In re Asbestos Products Liability Litigation (No. VI)*, 801 F. Supp. 2d 333, 336 (E.D. Pa. 2011) (finding that Mississippi had adopted the two-injury rule despite the fact that the Mississippi Supreme Court had not considered the issue); *Daley v. A.W. Charleston, Inc.*, 37 A.3d

35

1175, 1190 (Pa. 2012) (adopting the two-injury rule in Pennsylvania); *Pustejovsky v. Rapid-American Corp.*, 35 S.W.3d 643, 653 (Tex. 2000) (adopting the two-injury rule in Texas); *Hamilton v. Asbestos Corp., Ltd.*, 998 P.2d 405, 413 (Ca. 2000) (adopting the two-injury rule in California); *Sopha v. Owens-Corning Fiberglas Corp.*, 601 N.W. 2d 627, 636 (Wis. 1999) (adopting the two-injury rule in Wisconsin). *But see Kiser v. A.W. Chesterton Co.*, 736 S.E. 2d 910, 920 (Va. 2013) (declining to adopt the two-injury rule).

The Pennsylvania Supreme Court based its rationale for adopting a "two-injury rule" in mesothelioma cases, as distinguished from asbestosis actions, on the grossly different latency periods for the two disease processes.

> [T]he estimated latency period for mesothelioma is 30 to 50 years, whereas the estimated latency period for asbestosis and most lung cancers is 10 to 20 years. Thus, it is unlikely a plaintiff would be diagnosed with mesothelioma until long after he had been diagnosed with, and the statute of limitations had expired for, lung cancer. In addition, mesothelioma is often difficult to diagnose, due to nonspecific early symptoms and the lengthy latency period.

*Daley*, 37 A.3d at 1188 (alteration supplied) (footnotes omitted).

The Alabama Legislature has historically recognized the special situation that asbestos injuries pose for traditional statutes-of-limitation principles. In 1980, for example, the Legislature amended Alabama Code § 6-2-30 to state that asbestos-exposure claims "shall be deemed to accrue on the first date the injured

party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action." *See* Act of May 19, 1980, No. 80-566, § 2, 1980 Ala. Acts 876, 876–77 (codified as amended at Ala. Code § 6-2-30(b) (1975)).  The full text of the amended statute, which became effective on May 19, 1980, reads as follows:

> (a) All civil actions must be commenced after the cause of action has accrued within the period prescribed in this article and not afterwards, unless otherwise specifically provided for in this code.

> (b) A civil action for any injury to the person or rights of another resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action.  This subsection shall not apply to or affect in any way, actions referred to in Section 6-5-482.

Ala. Code § 6-2-30(b) (1975) (2005 Replacement Vol.).[81]  The legislative history of that statutory amendment contains the following statement of intent:

> **Section 1**. *Legislative Intent.*  The purpose of this amendment is to assure that the statute of limitations for injuries or deaths caused by exposure to asbestos, including asbestos-containing products, does not run on any Alabama citizen before that citizen has at least the opportunity to discover that cause of action.

> It is the intent of the Legislature that all Alabama citizens suffering the effects of any long-term disease process covered by this Bill should not be prevented by any statute of limitations from recovering the full measure of damages proximately caused by a third party tortfeasor which are allowable under any civil theory of liability,

---

[81] Alabama Code § 6-5-482, which is excepted by the last sentence of § 6-5-30(b), pertains to civil actions against physicians, surgeons, dentists, medical institutions, or other health care providers "for liability, error, mistake, or failure to cure, whether based on contract or tort," and also contains a "discovery clause." *See* Ala. Code § 6-5-482 (1975) (2005 Replacement Vol.).

provided action is brought within the statutory period of limitation from
the date of accrual.

Act of May 19, 1980, Act No. 80-566, § 1, 1980 Ala. Acts 876, 876 (all emphasis in
original).  That statement makes clear that a plaintiff like Alford Ray McGuffie, who
had no "opportunity to discover the cause of action" for his *mesothelioma* before it
was diagnosed, should not have his claim barred by a restrictive reading of § 6-2-30.

Further, while the Alabama Supreme Court has not yet addressed the issue
presented here, the Circuit Court of Mobile County, Alabama, did so when denying
summary judgment in the case styled *Nespor v. Standard Equipment Company, Inc.*,
CV-2009-900773 (Dec. 1, 2009).  That court held that mesothelioma was a distinct
disease from asbestosis, and that the plaintiff had appropriately filed the
mesothelioma claim at issue within two years of his mesothelioma diagnosis.  *Id*. at
2–4 (Dec. 1, 2009).  The facts of the *Nespor* case are similar to those of the present
action.  The plaintiff in that case had earlier filed suit for asbestosis; signed a release
as part of a settlement for such exposure; was subsequently diagnosed with
mesothelioma; and brought the suit at issue within two years following his diagnosis
of mesothelioma, but more than two years after his initial diagnosis of asbestosis.  *Id.*
at 1–2.  In support of its holding, the state circuit court relied on a strict interpretation
of Alabama Code § 6-2-30(b), accenting the language pinpointing "the injury giving
rise to such civil action," and noting that the statute was enacted "to increase the

opportunity for injured workers to bring claims," and not to restrict the ability those workers have to redress claims resulting from long-term disease-processes.  *Id.* at 2. As mesothelioma and asbestosis are unequivocally separate diseases, and mesothelioma was a distinct injury giving rise to the cause of action, the cause of action could not be barred by an earlier diagnosis of asbestosis.  *Id.*  Further, the court reasoned that "fear of cancer or mental anguish or mental distress relating to such fear are not available to a plaintiff in the State of Alabama concerning the potential for future cancer based upon exposures."  *Id.* at 3.  In other words, the *Nespor* court held that the plaintiff had no opportunity to recover damages for injuries resulting from mesothelioma prior to actually contracting the disease.  *See id.* at 2–3.

Based upon the text of the statute itself, and the clear statement of intent by the Legislature that drafted it, together with the undisturbed holding and reasoning of the persuasive opinion entered by the Circuit Court of Mobile County, Alabama, in *Nespor*, *supra*, and without compelling evidence to the contrary, it is the opinion of this court that the Alabama Supreme Court will, when presented with the opportunity to do so, adopt the "two injury rule."  Thus, the court will apply that rule to the facts of the present case.

The fact that asbestosis and mesothelioma are distinct injuries is vital:  "the injury giving rise to such civil action" in this case was mesothelioma, and that injury

was not discovered by Alford Ray McGuffie until 2005.  Neither Alford nor Iris McGuffie had any legal ability to recover any measure of damages for the entirely separate disease of mesothelioma on the date that Alford received his asbestosis diagnosis.    Accordingly, the statute of limitations for an asbestos-related mesothelioma suit could not, and did not, begin to run until 2005.  It follows, therefore, that the action in this case was commenced within the applicable limitations period.

## B

Defendants, nevertheless, allege they are entitled to judgment as a matter of law, based upon the language of the *pro tanto* release executed in 1995 by both Alford and Iris McGuffie.[82]

A provision waiving liability is typically enforceable.  *See, e.g.*, *Dunlap v. Regions Financial Corp.*, 983 So. 2d 374, 378 (Ala. 2007) ("[A]bsent fraud, a release, supported by valuable consideration and unambiguous in meaning, will be given effect according to the intention of the parties from what appears in the four corners of the document itself; and parol evidence is not admissible to impeach or vary its terms.") (quoting *Wayne J. Griffin Electric, Inc. v. Dunn Construction Co.*, 622 So. 2d 314, 317 (Ala. 1994)) (alteration supplied).  Further, Alabama Code § 12-21-109

---

[82] *See* doc. no. 104-1 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 16–23; *see also* doc. no. 105, at 16–23 (same).

provides that: "All receipts, releases and discharges in writing, whether of a debt of record, a contract under seal or otherwise, and all judgments entered pursuant to pro tanto settlements, must have effect according to their terms and the intentions of the parties thereto." Ala. Code § 12-21-109 (1975) (2005 Replacement Vol.).

Plaintiff advances two primary arguments in opposition to defendants' claim of release. First, plaintiff argues that the Mead defendants were not parties to or signatories of the release and, therefore, neither Iris nor Alford McGuffie understood that they were releasing Mead Corporation, MeadWestvaco, or MW Custom Papers, LLC, from liability.[83] Second, plaintiff's counsel posits that the release was not supported by valuable consideration when it was signed in 1995.[84]

## 1

Where the language of a release is unambiguous, the construction and application of that document is a question of law that may be decided on a motion for summary judgment. *See, e.g.*, *American National Fire Insurance Co., Inc. v. Hughes*, 624 So. 2d 1362, 1365 (Ala. 1993) ("[I]f a document is unambiguous, its construction and legal effect are questions of law that may be decided, under appropriate circumstances, by summary judgment.") (alteration supplied) (citing *Jehle–Slauson*

---

[83] *See* doc. no 115-2 (Plaintiff's Opposition Memorandum) ¶ 61.

[84] *Id.* ¶ 62.

41

*Construction Co. v. Hood–Rich Architects & Consulting Engineers*, 435 So. 2d 716 (Ala. 1983)).

Plaintiff relies on the holding of the Alabama Supreme Court in *Pierce v. Orr*, 540 So. 2d 1364 (Ala. 1989), which raised the evidentiary burden for overbroad party designations in a liability release.  That case held:

> Henceforth, *unnamed third-parties*, *referred to in the release as* "any and all parties" *or by words of like import*, who have paid no part of the consideration *and who* are not the agents, principals, heirs, assigns of, or who *do not otherwise occupy a privity relationship with the named payors*, must bear the burden of proving by substantial evidence that they are parties intended to be released, i.e., that their release was within the contemplation of the named parties to the release.

540 So. 2d at 1367 (emphasis supplied).

Subsequently, the Alabama Supreme Court clarified the *Pierce* holding in the case of *Regional Health Services, Inc. v. Hale County Hospital Board*, 565 So. 2d 109 (Ala. 1990).  The latter case held that unnamed third parties must prove by substantial evidence that they are the intended beneficiaries of a release *only where they are referred to in the release as* "any and all parties or persons":

> Our holding today, as it relates to the release of "claims," should be distinguished from the holding in our recent case referring to "any and all persons."  In *Pierce v. Orr*, 540 So. 2d 1364 (Ala. 1989), we held that unnamed third-parties, referred to in a release as "any and all parties," who have paid no consideration and who do not otherwise occupy a privity relationship with the named payors, bear the burden of proving by substantial evidence that they are parties intended to be released.  540 So. 2d at 1367.

42

*Regional Health Services*, 565 So. 2d at 114 n.2.

The release at issue here is not the sort of overbroad release addressed by the opinions in either the *Pierce* or *Regional Health Services* cases. Rather, the parties intended to be released are those with close, inextricably entwined, privity relationships to CAPCO, such that their interests are aligned as the former parents and shareholders of that joint venture. *Cf. McNeely v. Spry Funeral Home of Athens, Inc.*, 724 So. 2d 534, 539 (Ala. Civ. App. 1998) (noting that words like "parent" and "shareholder" suggest a closer relationship than that denoted by mere arms-length contractual interactions). When Alford and Iris McGuffie signed a release in conjunction with their settlement of the claims asserted in the Texas suit, and releasing CAPCO, that document explicitly insulated the former parents and stockholders of CAPCO from liability. Thus, plaintiff should have understood the intended beneficiaries also would include the successors to the former parents and shareholders of that company.

There is no ambiguity about the relationship of MW Custom Papers, LLC, to CAPCO. As discussed in Part III of this opinion, *supra*, The Cement Asbestos Products Company ("CAPCO") was created and operated by the Woodward Iron Company ("Woodward") and the American Smelting and Refining Company. Woodward held the majority interest in that joint venture.

43

On November 30, 1968, Woodward and The Mead Corporation ("Mead") merged, with Mead becoming the surviving corporation.  Thus, Mead became the successor to Woodward's majority interest in the CAPCO joint venture, as well as The National Cement Company.

Later, Mead and another entity, Westvaco Corporation, became wholly owned subsidiaries of a new entity, known as the MeadWestvaco Corporation ("MeadWestvaco") through a stock-for-stock exchange merger.  As a result of that merger, MeadWestvaco became the successor to the majority interest in the CAPCO joint venture formerly held by Woodward and then Mead.

Subsequent to that merger, Mead (as a wholly-owned subsidiary of MeadWestvaco) was merged into a newly formed corporate entity named "MW Custom Papers, Inc."  That corporate entity was later converted into a limited liability company known as "MW Custom Papers, LLC," with MeadWestvaco as its sole member.  At that point, all of the former entities were reduced to two — MW Custom Papers, LLC, and MeadWestvaco Corporation, as the sole member of that limited liability company.

However, as ultimately determined in Part III.E of this opinion, *supra*, MW Custom Papers, LLC, is the relevant entity to answer plaintiff's remaining claim.  It

is the *successor* to the controlling interest in the CAPCO joint venture and plant formerly held by Woodward and Mead.

In this instance, the language of the release was unambiguous: the McGuffies released all former CAPCO parents and stockholders, and the successors of those parents and stockholders, from "any and all claims" arising from asbestos-related injury or death occuring at the time of the release or "in the future."[85]  *See, e.g., Schultz v. Southeast Supply Heater,* LLC, 661 F. Supp. 2d 1260, 1268–69 (S.D. Ala. 2009), *aff'd* 376 F. App'x 986 (11th Cir. 2010) ("As the Alabama Supreme Court has previously noted, 'all' is all.  'All' is not ambiguous.  'All' is not vague.  'All' is not of doubtful meaning. . . .  Like the word 'all,' the word 'future' is unambiguous." (alteration supplied) (internal quotation marks omitted) (quoting *Texas National Bank, N.A. v. West*, 631 So. 2d 212, 222 (Ala. 1993))).  The category of entities that constitute former parents and stockholders of CAPCO is necessarily limited, and far narrower than the phrase "any and all parties" that was addressed in *Pierce v. Orr, supra.*  Accordingly, it cannot be construed in any manner other than to include MW Custom Papers, LLC.

---

[85] *See* Part II of this opinion, *supra*, and particularly those portions of the *pro tanto* release executed by Alford and Iris McGuffie that are quoted in the text preceding note 35.

45

Nonetheless, plaintiff asserts two arguments that purport to raise an issue of material fact as to whether The Mead Corporation was actually a stockholder of CAPCO.[86]

First, plaintiff argues that MW Custom Papers, LLC, has alternatively referred to itself as both a former parent and a former stockholder of CAPCO.[87]  Semantics aside — a corporate "parent" is, by definition, also a stockholder of the subsidiary corporation[88] — this distinction is not relevant for purposes of the release at issue, because the "present and former parents, subsidiaries, [and] successors" of CAPCO were equally indemnified by the release.[89]

Second, plaintiff contends that, because The Mead Company was a corporation, and the 1990 edition of Black's Law Dictionary defines "stockholder" as "a *person who owns stock in a corporation or joint-stock company*," Mead cannot have been a

---

[86] *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶¶ 67–68.

[87] *See id.* ¶ 67.

[88] *See* BLACK'S LAW DICTIONARY 393 (9th ed. 2009) (defining *parent corporation* as "[a] corporation that has a controlling interest in another corporation (called a *subsidiary corporation*), usu[ally] through ownership of more than one-half [of] the voting stock. — Often shortened to *parent*. — Also termed *parent company*") (alterations supplied, italicized emphasis in original).

[89] *See* Part II of this opinion, and particularly those portions of the *pro tanto* release executed by Alford and Iris McGuffie that are quoted in the text accompanying (and preceding) note 35, *supra* (*e.g.*, "we, the undersigned, . . . hereby fully and finally RELEASE, ACQUIT and FOREVER DISCHARGE the RELEASEES and each of the RELEASEE'S *present and former parents, subsidiaries, successors, predecessors and assigns . . . and stockholders* of all such corporations from any and all claims, demands, causes of action of whatsoever nature or character for asbestos-related disease or death which we may now have or hereafter have against the RELEASEES, including by example, but not limited to . . . negligence . . . .") (emphasis supplied).

46

stockholder because all stockholders must be human.[90]  This argument is frivolous and cannot prevail.  A corporation is a legal entity that is capable of owning stock in a separate corporate entity.

In sum, the *pro tanto* release unambiguously freed all "present and former parents, subsidiaries, [and] successors" of CAPCO from asbestos-related liability. MW Custom Papers, LLC, became the successor of the majority interest in the CAPCO joint venture and plant initially held by Woodward and then Mead.  Stated differently, to the extent that a plaintiff desired to assert a claim against the entity that held majority control over CAPCO from 1968 to 1974, the only entity that individual could bring a claim against is MW Custom Papers, LLC.  Therefore, this court construes the *pro tanto* release executed by the McGuffies in 1995 as stating a clear intent to release *all* former parents, subsidiaries, successors, and stockholders of CAPCO during Alford McGuffie's time of employment, which includes the successor to Woodward and The Mead Corporation, MW Custom Papers, LLC.

## 2

Plaintiff also contends, in the alternative, that the release signed by Alford and Iris McGuffie was not supported by valuable consideration.  Plaintiff did not expound on this argument, either in briefs filed with this court or at oral argument.  It is

---

[90] *See* doc. no. 115-2 (Plaintiff's Opposition Memorandum) ¶ 68 (emphasis supplied).

evident, nonetheless, that $150 is a paltry sum for the relinquishment of Alford and

Iris McGuffie's ability to bring suit for any asbestos-related injury in the future.[91]

Ultimately, however, inadequacy of value is not sufficient to vitiate a release

for lack of consideration under Alabama law.  As the Alabama Supreme Court has

observed:

> The rule is too well settled, even to admit of argument, that consideration in fact bargained for is not required to be adequate in the sense of equality in value. *Corbin on Contracts*, § 127.  The mere inadequacy, alone, is never sufficient to vitiate a contract or conveyance valid, and the courts are not disposed to enter upon nice calculations to strike a balance on the one side or the other.  *Norrell v. Thompson*, 252 Ala. 603, 42 So. 2d 461, 462 [(Ala. 1949)].  Absolute equality is not to be hoped for, and is seldom attained in men's dealings one with the other.  Nor is consideration to be measured in terms of dollars and cents alone; convenience, avoidance of troublesome details and efforts are proper elements. *Decker v. Decker*, 253 Ala. 345, [350,] 44 So. 2d 435[, 438 (Ala. 1950)].

*Grimes v. Liberty National Life Insurance Co.*, 514 So. 2d 965, 967 (Ala. 1987)

(alterations supplied) (quoting *Marcum v. Embry*, 282 So. 2d 49, 54 (Ala. 1973), as

quoted in *Finley v. Liberty Mutual Insurance Co.*, 456 So. 2d 1065, 1068 (Ala.

1984)).  Simply put, under Alabama law, inadequate consideration, without more,

cannot invalidate a written release.  *See id.; Melvin v. Franklin Life Insurance Co.*,

151 So. 2d 238, 239 (Ala. 1963) ("[A] release in writing may not be attacked for a

lack of consideration alone.").

---

[91] Doc. no. 105-9 (Sept. 16, 1997 Deposition of Alford McGuffie, Part 2), at 113.

48

Given the language of the release at issue, plaintiffs unambiguously released all stockholders of CAPCO from all asbestos-related liability, specifically including injuries and death resulting from a future diagnosis of mesothelioma.  It cannot be reasonably disputed that The Mead Corporation, and therefore its  successor, MW Custom Papers, LLC, was both a former parent and stockholder of CAPCO and, thus, falls under the purview of the release.  Plaintiffs received something of value in exchange for executing the release, and even though the consideration exchanged appears to be tilted uncomfortably in favor of defendants, inequitable consideration is not, by itself, sufficient to challenge the validity of a written release.  Thus, there is no genuine issue of material fact on this issue and plaintiff's claims are ultimately barred under the legal doctrine of release.

## V

Finally, plaintiff alleges that defendants' motions for summary judgment are procedurally barred, and should be stricken, as they were not raised within the dispositive motion deadlines set by the scheduling order entered in the MDL court.[92] That argument is not persuasive.

The Northern District of Alabama is not bound by a scheduling order issued for the purposes of case management in the Eastern District of Pennsylvania.  Each

---

[92] *See* doc. no. 107 (Plaintiffs' [*sic*] Motion to Strike and Objections to Defendants' Motions for Summary Judgment), ¶¶ 1, 3.

district court has wide discretion to manage its own docket. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 683 (1997) ("[T]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Wilson v. Farley*, 203 Fed. App'x 239, 250 (11th Cir. 2006) ("A district court retains the inherent authority to manage its own docket.").

The procedural posture of this litigation has been unusual. Usually, the court issues a scheduling order following receipt of the parties' report of their Rule 26(f) status conference. This case, however, was transferred to the Eastern District of Pennsylvania by the MDL Panel before a status conference occurred. When the case was remanded, it was not accompanied by any documents, other than a copy of the MDL docket sheets, and the individual filings identified on those docket sheets were not immediately accessible to this court.[93] All of the motions discussed in this opinion were filed before this court gained access to the case file, and could review copies of pleadings filed in the MDL court.[94]

---

[93] *See* doc. no. 99 ("Order Lifting Stay of Conditional Remand Order," entered Sept. 12, 2011 as E.D. Pa. doc. no. 129).

[94] *Compare* doc. no. 104 (MW Custom Papers, LLC's Renewed Motion for Summary Judgment, filed Aug. 10, 2012); doc. no. 106 (MeadWestvaco Corp.'s Motion for Summary Judgment, filed Aug. 17, 2012); doc. no. 107 (Plaintiffs' [*sic*] Motion to Strike and Objection to Defendants' Motions for Summary Judgment, filed Aug. 28, 2012); *and* doc. no. 117 (MW Custom Papers, LLC's Motion to Strike Certain Exhibits in Plaintiff's Evidentiary Materials, filed Oct. 3, 2012) *with* doc. nos. 119 and 120 (Oct. 5, 2012 Notice of Filing Record on Remand from MDL 875).

Thus, the issuance of a scheduling order before obtaining the relevant portions of the record in the MDL court would have been unreasonable.  In the interim, this court issued appropriate orders establishing response deadlines to assure a "just" and "speedy" resolution of the case.  *See Wieters v. Roper Hospital, Inc.*, 58 F. App'x 40, 43 (4th Cir. 2003) (holding that the absence of a formal scheduling order does not disrupt the development of a case where the court promptly manages and schedules hearings on motions where appropriate).  In short, there is no basis to conclude that defendants were bound by *any* scheduling order on the dates their renewed motions for summary judgment were filed.  Defendants' motions were timely and plaintiff's motion to strike is due to be denied.

## VI

For the reasons stated in Parts I through IV, *supra*, the renewed motions for summary judgment filed by defendants, MeadWestwaco Corporation and MW Custom Papers, LLC, are due to be granted.  For the reasons stated in Part V above, plaintiff's motion to strike defendants' renewed motions for summary judgment is due to be denied.  The motion of defendant MW Custom Papers, LLC, to strike fewer than all of plaintiff's evidentiary materials will be denied as moot.  A final judgment consistent with this opinion will be entered contemporaneously herewith.

**ENTERED** this 21st day of February, 2014.

51

_____
United States District Judge